UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BERNARD SCHAFER et al.,

        Plaintiffs,

v.                                                                                          Case Number 12-13152
                                                                                            Honorable Thomas L. Ludington
MULTIBAND CORP.,

        Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFFS'
MOTION TO VACATE ARBITRATION DECISION**

Section 410(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1110(a), declares that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." Section 410(b), in turn, provides that insurance may be purchased to cover a fiduciary's potential liability. § 1110(b). Release agreements are thus void — insurance agreements, enforceable.

In the underlying arbitration in this case, the question for the arbitrator was whether indemnification agreements are void or enforceable. The arbitrator concluded that all such agreements are void. In doing so, the arbitrator disregarded clearly established legal precedent (including that of the Sixth Circuit) that such agreements are enforceable. Because this principle is clearly defined and the arbitrator refused to heed it, his decision will be vacated.

# I

## A

Plaintiffs Bernard Schafer and Henry Block founded Michigan Microtech, Inc., in 1985. Microtech sells and installs satellite television equipment.

In 2000, Microtech entered into a series of agreements with DirecTV. Among them was an agreement that Microtech would be the exclusive service provider of DirecTV for residential customers in Michigan. The relationship proved profitable. So Plaintiffs looked to expand to other markets.

In 2003, Plaintiffs acquired interests in a company providing similar services in Kentucky, DirecTECH, Inc. Remaining the sole owners of Microtech, Plaintiffs acquired partial ownership and management interests in DirecTECH. They also became members of the board of directors of DirecTECH.

## B

In 2003, DirecTECH and Plaintiffs executed indemnification agreements. These agreements indemnify Plaintiffs for losses arising from their actions as directors of DirecTECH, except those caused by "deliberate wrongful acts or gross negligence," providing:

> The Company hereby agrees to indemnify and hold the Board Member harmless from and against any and all past, present or future losses, claims, damages, expenses, or liabilities (including, but not limited to, reasonable attorney's fees, court costs, judgments, fines, excise taxes related to litigation or aggregate amount pain [sic] in reasonable settlement of any actions, suites [sic], proceedings, or claims) (hereinafter collectively referred to as "Loss"), incurred in connection with any and all actions, proceedings, or suits of any kind or nature whatsoever, which arises as a result of acts or omissions of the Board Member within the scope of his activities for and on behalf of the Company and which do not involve deliberate wrongful acts or gross negligence by the Board Member.

In 2004, Microtech executed agreements in favor of Plaintiffs containing an identical indemnification provision. Under the agreements, Plaintiffs are again indemnified for losses

arising from their actions as directors of Microtech — except those caused by "deliberate wrongful acts or gross negligence."

## C

Also in 2004, Microtech formed an employee stock ownership plan ("ESOP") and employee stock ownership trust ("ESOT").[1] Plaintiffs were named as trustees of the Microtech ESOP.

Again, indemnification agreements were executed in favor of Plaintiffs, with the agreements providing:

> Subject to the relevant provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Michigan Microtech hereby agrees to discharge, indemnify and hold Trustee and his authorized agents and/or his representatives (hereinafter "Indemnities") harmless from and against:
>
> (a) Any and all reasonable costs and expenses incurred by Trustee in the enforcement of this Agreement, including, but not limited to, reasonable attorneys' fees, expenses and court costs, and
>
> (b) Any and all past, present or future losses, claims, damages, expenses, or liabilities (including, but not limited to, attorneys' fees, court costs, judgments, fines, excise taxes, time charges for Trustee's time related to litigation . . . provided, however, that the provisions . . . shall not apply to [a] Trustee who the extent any Loss is determined to have resulted from the grossly reckless/negligent and/or intentional misconduct of Trustee.

DirecTECH also formed an ESOP and ESOT. Plaintiffs, however, were not named as trustees of the DirecTECH ESOP.

To summarize, Plaintiffs receive the same indemnity as directors of DirecTECH and Microtech — and essentially the same indemnity as trustees of the Microtech ESOP. They are

---

[1] As a general matter, the United States Code confers favorable tax treatment on qualifying employee stock ownership trusts. Under 26 U.S.C. §§ 402 and 1042, if certain requirements are met a corporation can contribute tax deductible dollars to an employee stock ownership trust, have the trust pay such contributions to selling shareholders, and have the selling shareholders defer taxation on a capital gain.

indemnified for losses arising from their acts as directors and trustees, except those losses caused by intentional misconduct or gross negligence.

**D**

About this time, owners of Microtech and DirecTECH looked to expand again. Seeking economies of scale, in June 2005 they joined with two other satellite television installation companies, DirectTECH Southwest, Inc., and JBM, Inc., to form a holding corporation, DirecTECH Holding Company, Inc. ("Holding Company").

Owners of the four entities (including the DirecTECH and Microtech ESOPs) then exchanged their ownership interests for shares of stock in the Holding Company. The Holding Company, in turn, became the parent company of the four entities.

The Holding Company also formed an ESOP and ESOT.

**E**

Plaintiffs were named directors of the Holding Company and trustees of its ESOP and ESOT. Once again, indemnification agreements were executed in favor of Plaintiffs. Again, the agreements contain the same indemnity protection Plaintiffs received as directors of DirecTECH and Microtech. For example, the "director indemnity agreement" provides:

> The Company hereby agrees to indemnify and hold the Board Member harmless from and against any and all past, present or future losses, claims, damages, expenses, or liabilities (including, but not limited to, reasonable attorney's fees, court costs, judgments, fines, excise taxes related to litigation or aggregate amount pain [sic] in reasonable settlement of any actions, suites [sic], proceedings, or claims) (hereinafter collectively referred to as "Loss"), incurred in connection with any and all actions, proceedings, or suits of any kind or nature whatsoever, which arises as a result of acts or omissions of the Board Member within the scope of his activities for and on behalf of the Company and which do not involve deliberate wrongful acts or gross negligence by the Board Member.

Plaintiffs are likewise indemnified for losses arising from their acts as trustees of the Holding Company ESOP, except those caused by intentional misconduct or gross negligence.

The agreements also contain mandatory arbitration clauses providing that "any and all disputes arising pursuant to any of the terms of this Agreement or which relate in any manner whatsoever to this Agreement which cannot be resolved in a reasonable time by discussions between the Parties shall be submitted to arbitration in Mt. Pleasant, Michigan, before a sole arbitrator (the 'Arbitrator') selected from Judicial Arbitration and Mediation Services, Inc."

Establishing the scope of the arbitrator's authority, the agreements continue: "Final resolution of any dispute through arbitration may include any remedy or relief which the Arbitrator deems just and equitable, including any and all remedies provided by applicable state or federal statutes."

**F**

Also in 2005, the U.S. Department of Labor began investigating the Holding Company and its four subsidiaries. Specifically, it began investigating stock transactions involving the ESOPs and ESOTs. The department suspected that directors and trustees had breached their fiduciary duties by purchasing company stock for the ESOPs at inflated prices.

**G**

While that investigation was ongoing, Defendant Multiband Corp. began negotiating for the purchase of the Holding Company. In 2007, the parties agreed on a plan of acquisition and began transitioning operations to Defendant. During this transition, the Holding Company provided a detailed report of the department's investigation.

**H**

On January 1, 2009, Defendant completed the purchase of the Holding Company. For Plaintiffs' shares in the Holding Company, Defendant paid Plaintiffs $43.9 million. Defendant also executed an "indemnification agreement" and a "master assignment and assumption

agreement." Plaintiffs assert (and Defendant does not dispute) that these agreements were material to Plaintiffs' decision to sell. "Had Multiband not agreed to such indemnification obligations," Plaintiffs write, "the stock purchase price of $43.9 Million would have been substantially higher and/or the transaction would not have occurred." Pls.' Mot. to Vacate 6.

Both the inducement indemnity and the assumption agreement contain a mandatory arbitration clause (with the same terms quoted above).

The indemnification agreement provides that Defendant agrees to indemnify Plaintiffs for any losses "which arise as the result of acts or omission of the Board Member within the scope of his activities for and on behalf of [the Holding Company] . . . which do not involve deliberate wrongful acts or gross negligence by the board member." (Plaintiffs refer to this agreement as the "inducement indemnity.")

And the master assignment and assumption agreement provides that Defendant agrees to assume the agreements and obligations of the Holding Company, including the indemnification agreements with Plaintiffs. (Plaintiffs refer to this agreement as the "assumption agreement.") Specifically, the "assumption agreement" provided that Defendant "will assume all liabilities and contingent liabilities outlined in this Agreement."

The agreement further provides that the Holding Company "assigns . . . and [Defendant] expressly assume[s] all covenants, agreements, obligations and liabilities of [the Holding Company] under the applicable [Holding Company] Obligations as if they were the original party thereto, including, without limitation, all indemnity, reimbursement and other payment obligations." Exhibit A to the assumption agreement expressly identifies the indemnity agreements executed in favor of Plaintiffs discussed above.[2]

---

[2] Defendant, it should also be noted, is a stranger to the ESOPs that it is indemnifying Plaintiff against under the assumption agreement. Defendant is neither administrator, fiduciary, nor sponsor of any of the ESOPs.

**I**

In March 2009, the Department of Labor sent letters to the directors of the Holding Company and its subsidiaries, as well as the trustees for the ESOPs, including Plaintiffs. The letters inform the reader that the directors and trustees have breached their fiduciary duties by allowing the various ESOPs to purchase company stock at inflated prices.

Regarding Plaintiffs in particular, the department questioned the DirecTECH ESOP transaction, the Microtech ESOP transaction, and the Holding Company ESOP transaction. The department's initial settlement offer to Plaintiffs was $42 million.

Plaintiffs notified Defendant of the letter and requested indemnification for expenses incurred in defending against the accusations. Defendant declined to provide it.

In December 2009, the department filed a civil suit against various persons and entities, including Plaintiffs, in the United States District Court for the Eastern District of Kentucky. Again, Plaintiffs requested indemnification. Again, Defendant declined.

In 2011, Plaintiffs reached a settlement agreement with the department. Plaintiffs agreed to each pay $1,450,000 to the department while admitting no liability for the allegations in the department's complaint. The court entered the consent judgment order containing the terms of the settlement in June 2011.

This litigation followed.

**J**

On October 18, 2011, Petitioners filed an arbitration complaint against Defendant. Plaintiffs' claims included: (1) breach of contract, based on the various indemnification agreements; (2) fraudulent inducement, based on the inducement indemnity and the assumption

agreement; and (2) estoppel, based on Defendant's alleged assurances that it would honor its indemnification obligations.

Defendant responded that the indemnification agreements were void as against public policy under 29 U.S.C. § 1110(a).[3]

The parties then agreed to submit three issues to the arbitrator for summary disposition. The issues were:

(1) Is an agreement between a former fiduciary to an ESOP [Plaintiffs], on one hand, and a third party stranger to the ESOP [Defendant], on the other, invalid or unenforceable under 29 U.S.C. § 1110, as a matter of law, where the third party agrees to indemnify the fiduciary against claims arising from its past acts or omissions as a fiduciary?

(2) Is an agreement between a company sponsoring an ESOP [the Holding Company], on one hand, and a third party stranger to the ESOP [Defendant], on the other, invalid or unenforceable under 29 U.S.C. § 1110, as a matter of law, where the third party agrees to indemnify the company's directors and former trustees to the ESOP [Plaintiffs] against claims arising from their past acts or omissions as fiduciaries?; and

(3) Does the payment of a settlement render the indemnity agreements inapplicable or void under 29 U.S.C. § 1110 as a matter of law?

In June 2012, the arbitrator rendered his decision.

**K**

"Distilled to their essence," the arbitrator wrote, "all three issues pose a single question: Are the indemnity agreements invalidated by ERISA Section 410(a), 29 U.S.C. § 1110(a)." Arbitration Decision 5, *attached as* Compl. Ex. 1. The arbitrator answered this question in the affirmative, explaining:

> I find the statute's text to be clear and unambiguous. Section 410(a) is explicit: contractual provisions attempting to relieve an ERISA fiduciary of "responsibility or liability" for breach of fiduciary duty are "void as against public policy."

---

[3] That subsection, as noted, provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." § 1110(a). Subsection (b), as noted, goes on to provide that insurance is permissible.

-8-

> Section 410(b)'s clear, narrow, and unambiguous exception is for insurance policies. Those policies may be purchased by plans, employers, unions, or fiduciaries, provided that if a plan purchases the insurance, the insurer must have recourse against the fiduciary comparable to the plan itself.
>
> Indemnity agreements do not fall within this statutory scheme. Section 410 makes no provision for indemnity agreements. I find, therefore, no support in the Congressionally enacted law for the proposition that a private indemnity agreement is equivalent to the insurance Congress allows. The intent of Congress is clear from the unambiguous text of the statute, and so the inquiry ends.

*Id*. at 11. Addressing the clearly established precedent contrary to his decision, the arbitrator acknowledged that the courts, as well as the Department of Labor, have "concluded that ERISA § 410(a) permitted indemnity agreements." *Id*. at 8.

But the arbitrator found that this consensus is "simply at odds with, and flatly contradicted by, Congress' plain unambiguous language." *Id*. at 12. The interpretations of the Sixth Circuit, Seventh Circuit, and the Department of Labor, for example, the arbitrator criticized as unsupported by the text of the statute, writing:

> Courts concluded that while § 410(A) forbids indemnification of fiduciaries who have breached their duties — as that would relieve them of responsibility or liability — it might allow indemnification of fiduciaries who were exonerated or who settled claims without admitting liability. The Seventh Circuit, drawing an analogy to an award of attorney fees to a prevailing party authorized under 29 U.S.C. § 1132(g)(1), held § 410(a) did not void an agreement to indemnify a fiduciary who was exonerated of charges of breach of duty. And the Sixth Circuit drawing an analogy to insurance, concluded that because "ERISA explicitly permits parties to insure against possible liability, it would be illogical to interpret the statute as prohibiting indemnification agreements." The Sixth Circuit cited no supporting authority in concluding insurance and indemnity agreements were equivalent under ERISA.
>
> . . .
>
> Nor is the Department of Labor interpretive bulletin entitled to deference. . . . A reasonable interpretation of an ambiguous statute is entitled to deference. . . . Here, although nearly contemporaneous with the statute's enactment, the Department of Labor's interpretive bulletin is entitled to no deference — it is simply at odds with, and flatly contradicted by, Congress' plain unambiguous language of Section 410.

*Id.* at 9, 11 (citations omitted) (quoting *Phahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 837 (6th Cir. 2007)) (citing *Shelter Distrib. v. Gen. Drivers, Warehousemen & Helpers Local Union No. 89*, 674 F.3d 608, 612 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 233 (2012); *Tullis v. UMB Bank, N.A.*, 423 F. App'x 567, 571 (6th Cir. 2011); *Packer Eng'g, Inc. v. Kratville*, 965 F.2d 174, 176 (7th Cir. 1992); 29 C.F.R. § 2509.75–4).

Finally, the arbitrator reinforced his conclusion that indemnity agreements are void under 29 U.S.C. § 1110 with an economic analysis, writing: "A company that looks stable and well able to provide security for an ERISA plan today, may show itself unable to hold its place in this changing environment. Where insurance companies have state-regulated financial reserve requirements, there is no such requirement in business. One need look no further than Blockbuster, AOL, or dozens of fallen dot.coms to see the risk of private indemnitors." Arbitration Decision 14.

This case ensued.

## L

On July 18, 2012, Plaintiffs filed suit in this Court to vacate the arbitration decision. They write that it must be vacated because "the Arbitrator expressly disregarded controlling federal law and held for the first time in American jurisprudence, that Section 1110 categorically bars all private indemnification agreements between plan fiduciaries and third parties." Pls.' Mot to Vacate 8, ECF No. 9. That is, Plaintiffs move to vacate the decision because it "is contrary to and reflects a manifest disregard for controlling federal law." *Id.* at 10.

## II

### A

"When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 305 (6th Cir. 2008) (internal quotation marks and alterations omitted) (quoting *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005)).

The Federal Arbitration Act, 9 U.S.C. § 1 et seq., establishes "a presumption that arbitration awards will be confirmed." *See Nationwide*, 429 F.3d at 643 (citing 9 U.S.C. § 9). The Supreme Court explains: "Under the terms of § 9, a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11. Section 10 lists grounds for vacating an award, while § 11 names those for modifying or correcting one." *Hall St. Assocs. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008).

Here, as noted, Plaintiffs move to vacate the arbitrator's decision. Section 10 provides that a court may vacate an arbitration decision on four grounds:

(1)    where the award was procured by corruption, fraud, or undue means;

(2)    where there was evident partiality or corruption in the arbitrators, or either of them;

(3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10. The Supreme Court cautioned in *Hall Street* that "the statutory grounds are exclusive." *Hall St. Assocs.*, 552 U.S. at 578.

Two years after *Hall Street*, however, the Court observed that the traditional "manifest disregard of the law"[4] ground for review of an arbitrator's decision may have continued viability. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 n.3 (2010). Specifically, in dictum the Court wrote: "We do not decide whether 'manifest disregard' survives our decision in *Hall Street* as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10." *Id.* (citation omitted).

Prior to *Hall Street*, the circuits unanimously recognized "manifest disregard" as a ground for vacatur. Since, however, the circuits have split over whether manifest disregard survives. *See generally* Leigh F. Gill, Note, *Manifest Disregard After Hall Street: Back From the Dead — The Surprising Resilience of a Non-Statutory Ground for Vacatur*, 15 Lewis & Clark L. Rev. 265, 271–80 (2011) (discussing circuit split); Ann C. Gronlund, Note, *The Future of Manifest Disregard As A Valid Ground for Vacating Arbitration Awards in Light of the Supreme Court's Ruling in Hall Street Associates, L.L.C. v. Mattel, Inc.*, 96 Iowa L. Rev. 1351, 1363–69 (2011) (same); MyLinda K. Sims & Richard A. Bales, *Much Ado About Nothing: The Future of Manifest Disregard After Hall Street*, 62 S.C. L. Rev. 407, 424–29 (2010) (same).

The Sixth Circuit, for its part, has concluded (albeit with occasional reluctance) that manifest disregard lives on. *E.g.*, *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008) (Cole, J.) (holding that manifest disregard survives *Hall Street*); *Dealer Computer Servs., Inc. v. Dub Herring Ford*, 547 F.3d 558, 561 n.2 (6th Cir. 2008) (Keith, J.)

---

[4] *See generally* Michael H. LeRoy, *Are Arbitrators Above the Law? The "Manifest Disregard of the Law" Standard*, 52 B.C. L. Rev. 137, 145–51 (2011) (discussing the "obscure origin" of "manifest disregard" ground and asserting that it long predates *Wilko v. Swan*, 346 U.S. 427 (1953)).

(same); *Ozormoor v. T-Mobile USA, Inc.*, 08-11717, 2010 WL 3272620, *at 2 (E.D. Mich. Aug. 19, 2010) (Cohn, J.), *aff'd*, 459 F. App'x 502 (6th Cir. 2012); *Thomas Kinkade Co. v. Lighthouse Galleries, LLC*, 09-10757, 2010 WL 436604, at *6 & n.13 (E.D. Mich. Jan. 27, 2010) (Rosen, C.J.) (same); *but see Grain v. Trinity Health, Mercy Health Services Inc.*, 551 F.3d 374, 380 (6th Cir. 2008) (Sutton, J.) ("*Hall Street*'s reference to the 'exclusive' statutory grounds for obtaining relief casts some doubt on the continuing vitality of that theory.").

Specifically, the Sixth Circuit instructs that "[a] court's ability to vacate an arbitration award is *almost* exclusively limited to [the § 10] grounds, although it may also vacate an award found to be in manifest disregard of the law." *Coffee Beanery*, 300 F. App'x at 418 (emphasis supplied) (citing *Wilko v. Swan*, 346 U.S. 427, 436 (1953)); *see also Dealer Computer Servs.*, 547 F.3d at 561 n.2 ("A court may also vacate an award on non-statutory grounds if the arbitration panel demonstrates a 'manifest disregard of the law.'"). While it is uncertain whether the Supreme Court would reach the same result, this Court is obliged to follow the instructions of the Sixth Circuit.

**B**

Arbitrators manifestly disregard the law, the Sixth Circuit instructs, when "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Coffee Beanery*, 300 F. App'x at 418 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 420 (6th Cir. 1995)). The court cautions, however, that this is a "narrow" ground — "a mere error in interpretation or application of the law is insufficient.  Rather, the decision must fly in the face of clearly established legal precedent." *Id*.

At issue here, as noted, is whether indemnity agreements are valid under § 410 of ERISA, 29 U.S.C. § 1110. The arbitrator concluded that they are not — and this conclusion is contrary to clearly established legal precedent.

To begin with the text of the statute, subsection (a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." § 1110(a). Subsection (b), in turn, provides that insurance may be purchased to cover a fiduciary's potential liability. § 1110(b). Neither subsection expressly addresses whether indemnification agreements are permissible.

Taking up the question a year after the statute's enactment, the Department of Labor issued an interpretive bulletin concluding that indemnification agreements are permitted under the statute. Codified at 29 C.F.R. § 2509.75–4, the bulletin provides:

> The Department of Labor interprets this section to permit indemnification agreements which do not relieve a fiduciary of responsibility or liability under part 4 of title I. Indemnification provisions which leave the fiduciary fully responsible and liable, but merely permit another party to satisfy any liability incurred by the fiduciary in the same manner as insurance purchased under section 410(b)(3), are therefore not void under section 410(a).

*Id*. And this has been the department's position ever since.

The federal courts of appeals agree. As the Sixth Circuit explains, although § 410 prohibits an agreement that "purports to relieve" a fiduciary's liability, it permits an agreement that transfers that liability to another party:

> Under § 410(a), "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." This provision, however, merely prohibits agreements that diminish the statutory obligations of a fiduciary.

> Indemnification agreements do not prevent a fiduciary from being held liable, but instead only provide that if the fiduciary is held liable, then someone else will compensate the fiduciary for that liability. Moreover, ERISA § 410(b) states that a fiduciary may purchase insurance to cover potential liability and that an employer may purchase insurance to cover potential liability of fiduciaries. Given that ERISA explicitly permits parties to insure against possible liability, it would be illogical to interpret the statute as prohibiting indemnification agreements, which accomplish the same thing.

*Pfahler v. Nat'l Latex Products Co.*, 517 F.3d 816, 836–37 (6th Cir. 2007) (citations and quotation marks omitted) (paragraph break supplied) (quoting *IT Corp. v. Gen. Am. Life Ins. Co.,* 107 F.3d 1415, 1418–19 (9th Cir.1997)) (citing *Leavitt v. Nw. Bell Tel. Co.,* 921 F.2d 160, 161 (8th Cir. 1990)); *see also Tullis v. UMB Bank, N.A*., 423 F. App'x 567, 571 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1005, (2012).

As Judge Easterbrook pointed out: "How could anyone take seriously the proposition that ERISA forbids the indemnification of fiduciaries *wrongly* accused of misconduct, when ERISA itself allows a court to award fees to the prevailing side?" *Packer Eng'g, Inc. v. Kratville*, 965 F.2d 174, 176 (7th Cir. 1992) (Easterbrook, J.) (emphasis in original). Put simply, § 410 does not categorically prohibit indemnity agreements.

This legal principle is now black-letter law. The legal encyclopedia *American Jurisprudence*, for example, reports:

> Indemnification agreements that do not relieve a fiduciary of responsibility or liability do not violate the rules against exculpatory provisions. Therefore, indemnification provisions are not void if they leave the fiduciary fully responsible and liable, but merely permit another party to satisfy any liability incurred by the fiduciary in the same manner as insurance whose purchase is permitted.

60A Am. Jur. 2d *Pensions* § 516 (2nd ed. 2012) (collecting cases); *see generally* Ronald J. Cooke, *ERISA Practice and Procedure* § 6.32 (same).

The arbitrator was aware of this legal principle. He chose to disregard it. Instead, as noted, he concluded: "I find the statute's text to be clear and unambiguous. . . . Indemnity agreements do not fall within this statutory scheme." Arbitration Decision 11. Aside from his own interpretation of the text's plain meaning, the arbitrator offered no authority for his conclusion (apart from his economic analysis). He wrote: "The intent of Congress is clear from the unambiguous text of the statute, and so the inquiry ends." This was not a mere error in the interpretation or application of the law. The decision must be vacated.

### III

Accordingly, it is **ORDERED** that Plaintiffs' motion to vacate (ECF No. 9) is **GRANTED** and the arbitrator's decision is **VACATED**.

>s/Thomas L. Ludington
>THOMAS L. LUDINGTON
>United States District Judge

Dated: February 19, 2013

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 19, 2013.

>s/Tracy A. Jacobs
>TRACY A. JACOBS